**Andy NOLAN, Movant-Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 54514.**

Supreme Court of Missouri,
Division No. 2.

Nov. 10, 1969.

Dalton, Treasure & Bullard, Kennett, for appellant.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

On August 12, 1963, Andy Nolan entered pleas of guilty to murder in the first degree and assault with intent to kill and was sentenced to life imprisonment for

the murder and to ten years' imprisonment for the assault. The facts as the two offenses as testified to by Andy on this hearing were that he shot Arimes Watkins three times but did not kill him. As to shooting Mrs. McClinton he remembered picking her up in the yard and carrying her into the house but he did not remember her begging "Andy don't kill me," after as the state claimed he had shot her once and again at point-blank after carrying her into the house.

In any event, over five years after entering the pleas of guilty, September 18, 1968, he instituted this proceeding pursuant to Rule 27.26, V.A.M.R., to vacate not both sentences but the sentence of life imprisonment for the murder. The grounds of the motion are two: that, one, the court erred in accepting the plea of guilty to the murder because he had been "deprived of his privilege against self-incrimination" in that he had not been afforded counsel at a critical stage—when he had given the prosecuting attorney a tape-recorded statement, and, two, that his motion should have been sustained because at the time the court accepted his plea of guilty he did not understand the nature of the charges against him and the consequences of his pleading guilty and thus it is said "his plea was not a free and voluntary act." In December 1968 the court appointed Mr. James Bullard to represent Andy upon his 27.26 hearing and he has briefed and argued his cause in this court. In the murder case in 1962 Andy was represented by Senator John Noble and in the assault case by Mr. Gilbert D. Stephenson, both by appointment of the court. At the conclusion of a full hearing in this proceeding the court found that after being fully advised of his constitutional rights the defendant knowingly, voluntarily and intelligently entered a plea of guilty to the murder charge and therefore of course refused to vacate the sentence.

■ As stated the second claim relates to a tape-recorded statement Andy gave apparently on the day of or the day following his arrest and before either a preliminary hearing or the filing of a charge. But it is not alleged here that the tape-recorded statement entered into or had anything to do with his pleading guilty to the murder charge (the statement related to both offenses) and it was not used by the state in that case and the consequence is that it has no bearing whatever upon his conviction and is of no significance in this proceeding. Hughes v. United States, 371 F. 2d 694, 696 (8 Cir. 1967). His other and principal ground and contention that he did not understand the consequences of his pleading guilty to the charge of murder has been reduced to the single claim that he did not know and understand what "life" meant—"I was just dumb to the fact and didn't know what life meant." He now claims that in 1962 "I understood life means ten-six," that is ten years and six months and that is the sole basis of his claim for relief in this proceeding and so in fact he is not asking for a vacation of his sentence (as stated there is no attack on the 10 years' sentence for assault) but a reduction in the punishment: "To try to reduce this life, that's what I want a new trial for."

On the date of the hearing Andy Nolan was 43 years of age and so in 1962 was about 35. He went to the second grade in school and so is illiterate, he can neither read nor write. A reading of the record, however, and contrasting his direct examination with the cross-examination, reveals that while he may be unlettered he is not feeble-minded or even stupid nor so dumb as his answers on direct examination sought to convey. As stated, his claim is that "when I first got sentenced, I didn't understand what the big word means, and in fact of business I was just dumb to the whole case." He does not claim that anyone, the judge, the prosecuting attorney or his own attorney did anything "wrong," "Nobody, I just can't put no finger on nobody like that." Repeatedly he said that he knew "I was getting life plus ten, but what that life was, I didn't know what it meant." It is his position that his misunderstanding

came about from what Senator Noble told him, that "life" meant "ten-six." He does not say that Senator Noble promised him "ten-six" or even that he said as a fact that "life" meant "ten-six." He said on direct examination "he told me something like that:"

"THE COURT: He said life meant ten-six?

THE WITNESS: That's what you do on it, ten years and six months.

THE COURT: What did he tell you?

THE WITNESS: He just told me it was something like that.

THE COURT: You just tell me what he said.

THE WITNESS: Well, he told me, said 'You go there and stay ten year six months, you'll probably get out.' That's the way I understood it.

Q. (By Mr. Bullard.) Andy, you're not trying to say that Mr. Noble lied to you or anything, you're telling the Court you didn't understand or know any better?

A. No, I didn't say he lied. I was just dumb and didn't know what he meant about it."

On cross-examination there were these questions and answers:

"Q. But you knew when you were before Judge Goodman, you knew what you were getting then, didn't you?

A. No, I didn't.

Q. You knew you were getting life plus ten years?

A. I was getting life plus ten, but what that life was, I didn't know what it meant.

Q. Well, I think you've already testified that you got the impression from what Mr. Noble told you that life meant ten years and six months. What we're trying to find out is what did he tell you to give you that impression?

A. See, when he told me, says, 'You do'—I asked him, 'What is life, ten years, ten six?' And he told me 'Something like that.' Well, I figure I can go and stay ten years on this life and get a new number and start on this ten. I figured I could do that."

\*      \*      \*      \*      \*      \*

"Q. I'm asking you what your testimony is as to what Mr. Noble told you. Is it your testimony under oath that he told you that?

A. That's what he told me. He didn't tell me direct that's what it is, he said—

Q. I want to know what he told you.

A. He said somewhere in the neighborhood of that."

\*      \*      \*      \*      \*      \*

"A. He told me somewhere in the neighborhood of that, he didn't say it direct.

Q. But it's now that you realize that he wasn't promising you you'd get out in ten?

A. No, he didn't.

Q. You didn't understand that at the time?

A. He didn't promise me anything.

Q. He made no promise to you?

A. He made no promise.

Q. You just didn't understand what he was talking about.

A. I didn't understand nothing.

Q. But you're not trying to say that he promised you anything like that?

A. No."

\*      \*      \*      \*      \*      \*

"A. Fact of business, I know I can't do no natural life sentence.

Q. Well, isn't that what it is, you knew you were getting life for first degree murder when you pleaded guilty, you knew that, didn't you?

A. I knowed I was getting life, but I didn't know it meant to stay there the rest of your life.

Q. Well, weren't you told that there's a possibility of a parole at any time, but nobody can guarantee you a parole?

A. I was told I would be paroled in ten or twelve years.

Q. Did somebody promise you that or just say that might happen?

A. No, that's just a statement.

Q. They said it might happen?

A. It might happen.

Q. Did they also say it might not?

A. That's right."

Senator Noble said, "I consulted with Andy at the jail on any number of occasions, it was a serious offense, and I was rather worried about it, and of course I knew he was, too, and I did—I couldn't say how many times, but there were numerous, numerous times that I discussed the matter with him." When asked if he had told Andy that "life" meant "ten-six" Senator Noble said, "I can't tell what his impression might have been from what I discussed with him, I do know what I told him. I told him if he entered a plea of guilty to a life sentence, and went to the penitentiary and made a good prisoner, that there was a possibility that he would be paroled in from 13 to 15 years, and I did not make a statement to him as to a ten year period." He conceded that Andy was "dumb" but he said, "However, in regard to the entry of the plea or his decision to make the plea, I mean I left that entirely to him, and it was a decision for him to make. He was the defendant, and I did not try to influence him in connection with making the entry of the plea of guilty. * * * but when the final decision was made by him to enter a plea of guilty, I was satisfied that he understood what was being done. In other words, that it was better, his chances for entering the plea were better than to stand trial. I might add, also, I was concerned with his ability to make a determination, and filed a motion to have him examined, and he was examined over a period of four or five months up at Farmington, and they reported that he could understand the consequences of his act."

In addition to this testimony there was before the court a transcript of the proceedings before Judge Goodman. While the appellant states that he was sentenced on December 24, 1962, the transcript shows that he was arraigned on that date and the judge after formal questions as to age, literacy and nature of his occupation (farm work) and before appointing Senator Noble and Mr. Stephenson to represent him in both cases, "two very serious crimes," made a lengthy statement to him personally as to the nature of the charges "and what the possible penalties could be" admonishing him "if there is any part of it that you don't understand, now I want you to be certain to let me know, because the first thing we want to do is for you to be sure that you understand what the situation is." Then after explaining the charges in detail the court said, "Now, *a charge of first degree murder in Missouri is punishable by life imprisonment, that is imprisonment for the remainder of your natural life*, or by a death sentence, which would be putting you to death in what is commonly called the gas chamber, at Jefferson City." Then the court explained, "Now, first I want to explain to you that there isn't anything you have to do today, you don't have to do anything, you don't have to say anything or take any action or make any decision." Then the court explained his right to a trial and if a trial the jury's determination of the punishment—all of which would be at a future date. The court fully explained the helpfulness of counsel, the elements of murder and before appointing counsel concluded "Do you un-

derstand you don't have to do anything to-day? A. Yes, sir."

The next entry in the transcript before Judge Goodman is August 12, 1963, almost seven months after the arraignment and no doubt after the four or five months in the Farmington mental institution. It was on that occasion that the pleas of guilty were entered and on that occasion the transcript shows that after counsel for the state and Senator Noble for the defendant made brief statements, the court again addressed the appellant personally:

"Andy, you understand that you have entered a plea of guilty here to murder in the first degree, do you?

THE DEFENDANT: Yes, sir.

THE COURT: And the Prosecuting Attorney has recommended that *your punishment be fixed at confinement in the penitentiary for the remainder of your natural life*, and you also heard the statement your attorney made in your behalf. Is there anything you want to say for yourself?

THE DEFENDANT: *Natural Life?*

THE COURT: *That's the term of the sentence, that's what a life sentence is.* Is there anything you want to say?

THE DEFENDANT: No."

Whereupon Judge Goodman sentenced the appellant to life imprisonment on the charge of murder in the first degree.

■ As to the specific issue involved here the present circuit judge found that "the defendant was not advised that a life sentence meant ten years." And as indicated from the regretably long quotations from the oral evidence and from the transcripts before Judge Goodman in 1962 and 1963 there was compliance with Criminal Rule 25.04, on arraignment, the plea of guilty was made "voluntarily with understanding of the nature of the charge," and the findings of Judge Billings are supported, particularly in view of the precise relief

sought and accordingly the judgment denying relief in this 27.26 proceeding is affirmed. Turley v. State, Mo., 439 S.W.2d 521; Drew v. State, Mo., 436 S.W.2d 727; Crosswhite v. State, Mo., 426 S.W.2d 67; State v. Holland, Mo., 411 S.W.2d 181; United States ex rel. Nixon v. Follette, D. C., 299 F.Supp. 253.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.